IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JEREMY MARKS

    v.                  :   Civil Action No. DKC 13-0347

THOMAS DANN, et al.

**MEMORANDUM OPINION**

Presently pending and ready for review in this breach of fiduciary duty case are: (1) the motion to dismiss filed by Defendant Thomas Dann (ECF No. 21); (2) the motion to waive page limitation, also filed by Dann (ECF No. 24); and (3) the motion to seal the case filed by Plaintiff Jeremy Marks (ECF No. 2). The issues have been briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motions to waive page limitation and to dismiss will be granted, and the motion to seal will be denied.

**I.  Background**

The following facts are alleged in the verified complaint filed by Marks against Defendants Dann, Stanislav Licul, Nathan Cummings, Carlo DiNallo, and Maxtena, Inc. (ECF No. 1). Maxtena is a company specializing in antenna technology that was founded in 2006. At all relevant times, Licul, Cummings, and DiNallo have served as members of Maxtena's Board of Directors.

Consistent with Marks's usage and for ease of reference only, Licul, Cummings, and DiNallo will be referred to collectively herein as "the Control Group."

Marks co-founded Maxtena and, from 2006 until July 2010, served as an officer, director, and employee of the company. According to Marks, he "retained a roughly 34% equity interest" in Maxtena upon his "ouster" in July 2010. (ECF No. 1 ¶ 2). In April 2011, the Control Group purportedly caused Maxtena to file an action against Marks in this court captioned *Maxtena v. Marks*, No. DKC-11-945 (D.Md.). Among other assertions raised in *Maxtena v. Marks*, Maxtena alleges that it is entitled to repurchase Marks's shares for $100.00 because Marks was terminated for cause. (*See Maxtena v. Marks*, No. DKC-11-945, ECF No. 191, Second Am. Compl.). The parties to *Maxtena v. Marks* agreed to a stay of the case to conduct an initial period of financial and valuation discovery, followed by an exchange of expert reports on Maxtena's valuation and a court-supervised mediation. (*Id.*, ECF No. 40, Consent Order). According to Marks, during the course of valuation discovery in *Maxtena v. Marks*, he learned of a "scheme" executed by "the Control Group and non-party Maryland Venture Fund . . . to engineer a venture capital investment that artificially valued Maxtena at only $1,000,000," even though an outside consultant hired by Maxtena had "conservatively valued" the company as high as $20 million.

(ECF No. 1 ¶¶ 6-7).  Marks insists that the ultimate purpose of this investment was to allow "[t]he Control Group . . . to seize for themselves the value of Marks' equity" – in other words, "the objective behind the filing of *Maxtena v. Marks*."  (*Id.* ¶ 13).

According to Marks, the alleged "scheme" unfolded as follows.  In May 2012, Maxtena Chief Executive Officer Stani Licul began communicating with Frank Dickson, the then-manager of the Maryland Venture Fund ("MVF"), regarding a potential investment by the MVF in Maxtena.  The MVF is a division of the Maryland Department of Business and Economic Development ("the DBED") whose mission is to create jobs in the State of Maryland by attracting new businesses and encouraging the expansion and retention of existing business, including by providing workforce training and financial assistance.  Through its "Enterprise Investment Fund Program," the MVF uses appropriated public funds to make direct equity investments in emerging technology companies on behalf of the State.  In exchange, the companies must agree to, *inter alia*, maintain their principal places of business in Maryland for a period of five (5) years.

On July 10, 2012, the MVF appointed Dann, a "venture capital veteran," to serve as its Managing Director.  (ECF No. 1 ¶ 33 (internal quotation marks omitted)).  Shortly after his appointment, Dann allegedly presented an investment proposal to

Maxtena that had three components. (*Id.* ¶¶ 42-45). First, the proposal contemplated a $500,000 loan from the MVF to Maxtena, secured by a promissory note that would be subject to 10% per annum interest and due in one year. Second, the proposal stipulated that the MVF would have the right to convert its $500,000 promissory note, plus accrued interest, into Maxtena preferred stock based on a "pre-money valuation" of $1,000,000. Third, the proposal contemplated that, in the event that the MVF exercised its conversion option, Maxtena's employee stock option pool would be expanded to equal 74% of the company's capital stock and would provide each current Maxtena employee with the opportunity to acquire "substantially the same percentage of fully diluted ownership as that employee held prior" to the MVF's conversion. (*Id.* ¶ 45 (internal quotation marks omitted)).

According to Marks, Dann designed the MVF proposal to accomplish two things. First, the proposal was allegedly intended to dilute "massive[ly]" the equity interests of Maxtena's minority, non-employee shareholders – in other words, the shares of Marks and another former Maxtena employee, non-party Wayne Telman. (ECF No. 1 ¶¶ 46-47). Marks explains that, by contrast, the proposal served to preserve the equity interests of the Control Group, each of whom would be eligible

to participate in the expanded stock option pool as current Maxtena employees.

Second, Marks contends that Dann designed the proposal "to establish an artificially low 'market' valuation data point" for Maxtena to use during the mediation for *Maxtena v. Marks* in an attempt to secure a favorable settlement. (*Id.* ¶ 47). To support this assertion, Marks cites an email sent by Dann stating that the proposal "provide[s] a restructuring solution to the current shareholder dispute that hopefully will facilitate resolution of that matter" and another stating that "the [*Maxtena v. Marks*] litigation is a key driver in the deal structure." (*Id.* ¶¶ 47, 60). Marks also cites an email from Maxtena's contract Chief Financial Officer, non-party James Loving, who characterized Dann's proposal as being "very expensive" for Maxtena, explaining that the deal "basically valu[es] the company at about .3x revenues which is clearly a bargain." (*Id.* ¶ 48). In the same email, Loving remarked that "[i]t strikes me that if [Dann] thinks we can raise money at a $10[,000,000] valuation in a few months then [the MVF] should pay a higher price." (*Id.*).

Marks contends that, following the initial proposal by Dann, "[v]ery little true negotiation occurred between Maxtena and MVF." (ECF No. 1 ¶ 52). According to Marks, the Control Group did not seek more favorable terms for Maxtena, such as a

higher pre-money valuation, nor did they seek to protect the interests of non-employee shareholders like Marks. Instead, the Control Group allegedly sought to maximize their personal gains. For example, the Control Group purportedly asked Dann whether it would be possible to bypass the promissory note step altogether and go directly to the MVF's acquisition of equity in Maxtena. Dann agreed to this proposed change and observed that it would "facilitate resolution of the rogue shareholder issue." (*Id.* ¶ 53 (internal quotation marks and capitalization omitted)). Dann also allegedly agreed to an 80% expansion (as opposed to the initial proposal of 74%) of the employee stock option pool that allowed the Control Group to exercise their stock options at virtually no cost and without any vesting period.

On September 20, 2012, the MVF and Maxtena signed a "Commitment Letter" setting forth the terms of the MVF's equity investment in Maxtena ("the MVF Investment") and the subsequent employee stock option grant ("the Stock Option Grant"). (ECF No. 1 ¶ 61). The Commitment Letter stated that the MVF would purchase $560,000 of Maxtena preferred stock at a price of $0.3718 per share, based on a "fully-diluted pre-money valuation of Maxtena at $1,000,000." (*Id.* ¶ 62). The Commitment Letter also represented that, as part of the Stock Option Grant, the pool would be expanded by 80% and there would be no vesting period for the options. Finally, the Commitment Letter

established that, upon the closing of the MVF Investment, the MVF would provide a binding commitment for a $250,000 "Convertible Bridge Note" to be issued "in case the Company needs such funds to bridge to profitability and to a $5-$10 million Series B round[.]" (*Id.* ¶ 63). Marks asserts that the provision in the Commitment Letter contemplating future financing of $5 to $10 million is additional evidence that the MVF Investment relied on an artificially low valuation of Maxtena.

On October 3, 2012, Licul, Cummings, and DiNallo – who owned, respectively, 33.9%, 22.0%, and 5.1% of the company at that time – approved the MVF Investment in their capacities both as Maxtena directors and as Maxtena shareholders. Also on October 3 and following approval of the MVF Investment, Dann was appointed to Maxtena's Board of Directors. On October 15, 2012, the Board – including all four individual Defendants – approved the Stock Option Grant.

According to Marks, the MVF Investment and the Stock Option Grant were both approved without obtaining any fairness opinion; without performing any contemporaneous fair market valuation of Maxtena; without gathering any compensation analysis to support the fairness of the transactions; without appointing any independent director to approve the terms of the transactions; and without seeking ratification from the minority shareholders,

including Marks. Instead, the individual Defendants allegedly "rested on their collective, self-interested rationalizations for why the transactions were fair," as reflected in a Memorandum Agreement signed by the Control Group. (ECF No. 1 ¶¶ 77-78).

On February 1, 2013, Marks instituted this case by filing a three-count, verified complaint under seal. (ECF No. 1). Count I asserts a breach of fiduciary duty claim against Licul, Cummings, and DiNallo, based on their alleged roles in orchestrating and approving the MVF Investment and the Stock Option Grant. (*Id.* ¶¶ 90-96). Specifically, Marks alleges that each member of the Control Group breached his fiduciary duties of loyalty, good faith, and due care by putting his personal interests above those of Maxtena and minority shareholders like Marks. Marks seeks damages, including rescissory damages, along with rescission of the Stock Option Grant.

Count II alleges a breach of fiduciary duty claim against Dann based on his approval of the Stock Option Grant as a member of Maxtena's Board of Directors. (ECF No. 1 ¶¶ 97-104). Marks contends that, by approving the Stock Option Grant without ascertaining its fairness and for the purpose of "paying back" the Control Group for their approval of the below-market MVF Investment, Dann maliciously and intentionally breached his duties of good faith, loyalty, and due care, and acted beyond

the scope of his public duties as Managing Director of the MVF. In connection with Count II, Marks seeks damages, including rescissory damages, along with rescission of the Stock Option Grant.

Count III alleges a claim against Dann for "aiding and abetting breach of fiduciary duty" based on his role in "orchestrat[ing] and execut[ing]" the MVF Investment. (ECF No. 1 ¶¶ 106-11). Marks alleges that Dann used his venture capital experience to propose a transaction "that played on the conflict of interest" allegedly held by the Control Group, "to the detriment of Maxtena and Marks." (*Id.* ¶ 107). Marks asserts that, as a result, "Dann was able to secure a substantial ownership interest in Maxtena for the MVF at an exceptionally low price." Marks also alleges that Dann's aiding and abetting was "malicious, intentional, and beyond the scope of his public duties as Managing Director of the MVF." Marks seeks damages and rescissory damages for the aiding and abetting claim.

Simultaneously with his complaint, Marks filed a motion to seal the case (ECF No. 2) and an objection thereto (ECF No. 3). Marks explains that, although he filed his complaint under seal because it references information produced during discovery in *Maxtena v. Marks* that is subject to a protective order, he has no interest in protecting the confidentiality of any information contained therein. (*Id.* at 1).

On February 22, 2013, Maxtena answered the complaint. (ECF No. 15). Maxtena also filed a "reply" to Marks's objection to his interim sealing motion, arguing that, until all parties entered their appearances, it was appropriate to maintain the *status quo* with respect to sealing. (ECF No. 16). Also on February 22, Licul, Cummings, and DiNallo filed a joint answer to the complaint. (ECF No. 12).

On March 21, 2013, Dann filed a motion to dismiss the claims in Counts II and III pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), accompanied by a 63-page memorandum of law. (ECF Nos. 21 & 21-1). Dann subsequently filed a motion for leave to exceed the page limitation established by Local Rule 105.3 (ECF No. 24), which Marks opposed (ECF No. 23). Marks later filed a substantive response in opposition to Dann's motion to dismiss (ECF No. 27), and Dann replied (ECF No. 28).

## II. Motion to Exceed Page Limitations

Pursuant to Local Rule 105.3, memoranda in support of a motion are not to exceed fifty (50) pages, exclusive of attachments, absent leave of the court. As Dann belatedly acknowledged, the memorandum he filed in support of his motion to dismiss exceeds the maximum allotted page number by more than 20%. According to Dann, both the length of the complaint and the complexity of the legal issues presented by Marks's claims warrant a waiver of the standard page limit. (ECF No. 24).

Marks responds that the length of Dann's brief is a result of "self-imposed complexity" and that the memorandum includes extraneous information solely for the purpose of "smearing" Marks. (ECF No. 23).

Although "[c]umbersome filings . . . are a considerable drain on judicial resources," *Sampson v. City of Cambridge, Md.*, No. WDQ-06-1819, 2008 WL 7514365, at *3 (D.Md. June 5, 2008), Dann's motion for leave to exceed the page limitation will be granted, and his brief will be considered in its entirety.

## III. Motion to Dismiss

### A.    Standards of Review

Dann seeks dismissal for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), and for failure to state a claim, pursuant to Rule 12(b)(6).

In a Rule 12(b)(1) motion challenging subject matter jurisdiction, "evidence outside the pleadings" may be considered to determine whether there is jurisdiction over the case. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991); *see also Evans v. B.F. Perkins Co., a Division of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). A Rule 12(b)(1) motion should be granted "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co.*, 945 F.2d at 768.

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville,* 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

In considering a Rule 12(b)(6) motion, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989). Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations

devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.R.Civ.P. 8(a)(2)). Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## B. Analysis

Dann raises several arguments in his motion to dismiss. (*See* ECF No. 21-1). First, Dann contends that the court lacks subject matter jurisdiction over Marks's claims against him because the State of Maryland – not Dann – is the real party in interest and has not waived its Eleventh Amendment immunity to suit in federal court for tort claims. To the extent that Marks seeks to hold Dann liable in his individual capacity, Dann contends that he is entitled to statutory immunity pursuant to the Maryland Tort Claims Act ("the MTCA") because the complaint's allegations do not plausibly establish that he acted outside the scope of his public duties or that he acted maliciously. Dann also asserts that, under Delaware law, both

counts asserted by Marks are derivative, rather than direct, in nature, and therefore are subject to dismissal for failing to comply with the pleading requirements set forth in Fed.R.Civ.P. 23.1.  Finally, Dann argues that Marks fails to state a claim under Delaware law for breach of fiduciary duty or aiding and abetting.  As discussed below, although his Eleventh Amendment argument is misplaced, Dann's position regarding statutory immunity is both meritorious and dispositive.

**1.  Eleventh Amendment Immunity**

The Eleventh Amendment to the United States Constitution precludes private individuals from suing States and their agencies in federal court, unless Congress has abrogated the State's immunity or the State itself has waived immunity or otherwise consented to suit.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99-100 (1984).  The immunity afforded by the Eleventh Amendment extends to suits for monetary damages brought against a State official in his official capacity because such a suit "is no different from a suit against the State itself."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  Conversely, the Eleventh Amendment does not bar suits for damages against State officers who are sued in their individual capacities.  *Sales v. Grant*, 224 F.3d 293, 297 (4th

Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)).[1]

Here, it is apparent from the face of the complaint that Marks seeks to sue Dann for monetary damages in his individual capacity. As noted, the Eleventh Amendment poses no bar to such claims. Dann nonetheless urges the court to look beyond Marks's allegations to determine that the State of Maryland is the real party in interest because, at all relevant times, "the conduct, decisions and actions of Mr. Dann were the conduct, decisions and actions of the [MVF]," an arm of the State. (ECF No. 21-1, at 31–37). According to Dann, "[i]f the plaintiff was injured, he was injured by the [MVF] and the State, and he may only seek redress" against the State. (*Id.* at 37). Dann thus maintains that Marks's tort claims should be viewed as being asserted against the State, and, consequently, must be dismissed pursuant to the Eleventh Amendment because the State of Maryland's limited waiver of sovereign immunity established by the MTCA does not extend to tort suits brought in federal court.

Although asserted as an Eleventh Amendment argument that should be considered pursuant to Rule 12(b)(1),[2] Dann offers no

---

[1] Additionally, the Eleventh Amendment does not foreclose suits against State officials when a plaintiff seeks prospective relief to end a continuing violation. *Ex Parte Young*, 209 U.S. 123, 167 (1908).

authority – nor is the undersigned aware of any – that permits a court to disregard a plaintiff's unequivocal attempt to assert claims for monetary damages against a State official in his individual capacity in favor of substituting the State as the defendant.[3]  Rather, the gravamen of Dann's "real party in interest" contention is that he should be shielded from individual liability because he was acting on behalf of the State at all relevant times and therefore is entitled to statutory immunity pursuant to the MTCA.  This argument turns on

---

[2] Although Eleventh Amendment immunity is not a "true limit" on a federal court's subject matter jurisdiction, *Roach v. W. Va. Reg'l Jail & Corr. Auth.*, 74 F.3d 46, 48 (4th Cir. 1996), courts in the Fourth Circuit have nonetheless considered Eleventh Amendment questions pursuant to Fed.R.Civ.P. 12(b)(1) "because [they] ultimately challenge[] this Court's ability to exercise its Article III power." *Beckham v. Nat'l R.R. Passenger Corp.*, 569 F.Supp.2d 542, 547 (D.Md. 2008); *see also Verizon Md. Inc. v. RCN Telecom Servs., Inc.*, 232 F.Supp.2d 539, 546 (D.Md. 2002).

[3] The only case cited by Dann to support his argument is *Idaho v. Couer d'Alene Tribe of Idaho*, 521 U.S. 261 (1997). That case, however, involved a plaintiff's attempt to assert claims for injunctive and declaratory relief against State officials pursuant to the *Ex Parte Young* doctrine. *See id.* at 269-70. Ultimately, the Supreme Court held that the *Young* exception did not apply because, if the plaintiffs prevailed, the injunctive relief they would be entitled to would affect the State of Idaho's "sovereign interest in its lands and waters" in a way that would be "as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.* at 287. Here, Marks is not relying on the fiction of *Ex Parte Young* in an attempt to circumvent the Eleventh Amendment and force the State of Maryland to take some sort of prospective action with respect to the MVF Investment by, for example, rescinding the deal. Instead, Marks plainly is seeking money damages against Dann in his individual capacity.

16

whether the MTCA applies in this federal diversity action and whether Marks's factual allegations sufficiently allege malice – two questions that are properly considered pursuant to Rule 12(b)(6).

**2.  Statutory Immunity**

The MTCA is codified in several sections of the Maryland Code. Section 12-104 of the State Government Article, titled "Waiver of Immunity," provides as follows:

> (a) *In general.* –
>
> > (1) Subject to the exclusions and limitations in this subtitle and notwithstanding any other provision of law, the immunity of the State and of its units is waived as to a tort action, in a court of the State, to the extent provided under paragraph (2) of this subsection.
> >
> > (2) The liability of the State and its units may not exceed $200,000 to a single claimant for injuries arising from a single incident or occurrence.
>
> (b) *Exclusions and limitations.* – Immunity is not waived under this section as described under § 5-522(a) of the Courts and Judicial Proceedings Article.

Md. Code Ann., State Gov't § 12-104(a)-(b).  Section 5-522 of the Courts and Judicial Proceedings Article states, in relevant part, that:

> (a) *Tort liability – Exclusions from waiver under § 12-104 of the State Government Article.* – Immunity of the State is not

> waived under § 12-104 of the State
> Government Article for:
>
> . . .
>
> > (4) Any tortious act or omission of
> > State personnel that:
> >
> > > (i) Is not within the scope of the
> > > public duties of the State
> > > personnel; or
> > >
> > > (ii) Is made with malice or gross
> > > negligence;
> >
> > . . .
> >
> > (b) *In general.* – State personnel, as
> > defined in § 12-101 of the State Government
> > Article, are immune from suit in courts of
> > the State and from liability in tort for a
> > tortious act or omission that is within the
> > scope of the public duties of the State
> > personnel and is made without malice or
> > gross negligence, and for which the State or
> > its units have waived immunity under Title
> > 12, Subtitle 1 of the State Government
> > Article, even if the damages exceed the
> > limits of that waiver.

Md. Code Ann., Courts & Jud. Proc. § 5-522(a)-(b). The Court of
Appeals of Maryland has observed that, when read in tandem,
these provisions establish that the tort "liability of the State
and [the tort] liability of individual State personnel are
mutually exclusive. If the State is liable, the individual is
immune; if the individual is liable, the State is immune."
*Newell v. Runnels*, 407 Md. 578, 635 (2009). Where a complaint
sufficiently alleges either that an individual State employee
was acting with malice or gross negligence, or that he was

acting outside the scope of his public duties, dismissal based on statutory immunity grounds is not warranted. *See Barbre v. Pope*, 402 Md. 157, 181-82 (2007).

Both parties assume, without discussion, that the immunity afforded by the MTCA – a Maryland statute – can require dismissal of a federal lawsuit against a State employee who is sued in his individual capacity for common law torts. (*See* ECF No. 21-1, at 37-40 & ECF No. 27, at 22-29). At the same time, the parties also appear to agree (*see* ECF No. 21-1, at 47-63 & ECF No. 27, at 32-45) that the success of Marks's causes of action for breach of fiduciary duty and aiding and abetting would turn on Delaware law by virtue of the "internal affairs doctrine" – a conflict of laws principle pursuant to which the law of the State where an entity is incorporated generally governs disputes regarding the entity's internal management. *See generally* Restatement (Second) of Conflict of Laws §§ 302, 309 (1971 & 2013 Supp.) (describing the internal affairs doctrine). Thus, the parties apparently assume that Maryland law governs the statutory immunity issue, while Delaware law would ultimately provide the rule of decision.

Because jurisdiction in this case is premised on diversity of citizenship, testing the parties' assumptions requires application of Maryland choice of law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). The Court

of Appeals of Maryland has endorsed the internal affairs
doctrine on several occasions. *See, e.g.*, *Storetrax.com, Inc.
v. Gurland*, 397 Md. 37, 52 (2007) ("the laws of the state of
incorporation generally will govern matters involving the
internal workings of a corporation," unless a different state
"has the most significant relationship with the controversy").
As the parties do, it will be assumed – for purposes of this
Memorandum Opinion only – that the internal affairs doctrine, as
recognized in Maryland, would require application of Delaware
law to determine whether Marks can prevail on his breach of
fiduciary duty and aiding and abetting claims.

This conclusion does not necessarily mean that the issue of
immunity is also governed by Delaware law. On several
occasions, the Court of Appeals of Maryland has "embrace[d] the
concept of dépeçage," defined as "choice of law on an issue-by-
issue basis." *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620
(2007) (internal quotation marks omitted) (in a first party
action for uninsured motorist benefits, the laws of Maryland
applied to issues of contract formation and coverage pursuant to
the *lex loci contractus* doctrine, while the laws of Delaware,
the place of the accident, applied to issues of fault and
damages pursuant to the rule of *lex loci delicti*). For example,
in *Hauch v. Connor*, 295 Md. 120, 125 (1983), the Court of
Appeals employed dépeçage in an action involving an automobile

accident brought by Maryland residents against a co-employee.
As to issues of "substantive tort law," the *Hauch* court held
that the laws of Delaware, the place of the automobile accident,
applied pursuant to the well-established rule of *lex loci
delicti.* *Id.* at 123-24. The court went on to observe, however,
that its "continued adherence to the rule of *lex loci delicti* .
. . does not end the inquiry in the present case" because of the
differences between Maryland and Delaware workmen's compensation
laws – namely, that Maryland's statute permits personal injury
actions against co-employees while Delaware law does not. *Id.*
at 125. The court reasoned that, because the presence or
absence of a bar to suit embodied in a worker's compensation
statute constitutes a "threshold matter of whether the court is
open to a particular litigant" and implicates the public policy
of the forum State, Maryland workmen's compensation law should
be applied. *Id.* at 133-34; *see also* Restatement (Second) of
Conflict of Laws § 145, cmt.d (1971) (one issue that commonly
requires a separate choice of law analysis is a party's immunity
from tort liability, which is frequently governed by the law of
the jurisdiction where the party is domiciled rather than the
jurisdiction where the accident occurred).

Although there do not appear to be any Maryland appellate
decisions applying dépeçage in the MTCA context, the reasoning
employed by *Hauch* suggests that, even if a plaintiff's tort

causes of action arise under another jurisdiction's law, a Maryland court would apply Maryland law to determine whether a State employee was entitled to immunity. Like a statute of limitations, statutory immunity under the MTCA is a "threshold matter of whether the court is open to a particular litigant" and implicates important policy issues. *Hauch*, 295 Md. at 134.

Providing further support for this conclusion is a 1996 opinion issued by the Attorney General of the State of Maryland addressing the liability that a sheriff might face if, during an out-of-State trip to bring a prisoner to Maryland for trial, a third party were injured either by the deputy or the prisoner. *See* "Law Enforcement Officers – Courts and Judges – Torts – Immunity – Transport of Prisoners from Another State Pursuant to Court Order," 81 Op. Att'y 207, 207 (Jan. 17, 1996), *available at* http://www.oag.state.md.us/Opinions/1996/81OAG207.pdf (last visited July 19, 2013). The Attorney General opined that "if the third party brings a tort action in Maryland, the sheriff or deputy will be immune from suit" by virtue of the MTCA, "provided the act or omission of the sheriff or deputy was not grossly negligent or malicious." *Id.* at 214-15. Given Maryland's continuing adherence to the *lex loci delicti* doctrine, the Attorney General's opinion suggests that a Maryland court would apply the MTCA to determine a State

employee's statutory immunity, even though the law of the place of injury would govern the third party's substantive tort claim.

In light of this authority, and consistent with the parties' arguments, it will be assumed that the MTCA can apply to immunize Dann against Marks's claims in this diversity action.[4]   Accordingly, to overcome the statutory immunity provided for in the MTCA, the complaint must plausibly allege that Dann acted either maliciously or outside the scope of his public duties.[5]   As explained below, the complaint fails to do either.

### a.   Malice

For purposes of the MTCA, "malice" refers to "actual malice," defined as "conduct 'characterized by evil or wrongful

---

[4] This result is also consistent with the teaching of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938), which "g[a]ve the states a means of indirectly limiting federal jurisdiction." Wright & Miller, Federal Practice & Procedure § 4211 (3$^d$ ed. updated April 2013).  In other words, under *Erie*, "[i]f a state closes its doors to a particular class of litigants or claims, a federal court, exercising diversity jurisdiction, cannot entertain a suit by such a litigant or on such a claim."   *Id.*; *cf. Angel v. Bullington*, 330 U.S. 183, 192 (1947) ("A federal court in North Carolina, when invoked on grounds of diversity of citizenship, cannot give that which North Carolina has withheld.").   Although this particular effect of *Erie* has been criticized, *see* Wright & Miller, Federal Practice & Procedure § 4211, the contrary result here – *i.e.*, that the MTCA has no effect in this court even when the statute would bar the same suit if filed in a Maryland court – would encourage the type of forum-shopping that *Erie* sought to eliminate.

[5] Marks does not contend that the complaint sufficiently alleges that Dann acted with gross negligence.

23

motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud.'" *Lee v. Cline*, 384 Md. 245, 268 (2004) (quoting *Shoemaker v. Smith*, 353 Md. 143, 163 (1999)); *see also Thacker v. City of Hyattsville,* 135 Md.App. 268, 300 (2000) (actual malice can be established by proving that an employee "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff"). The Court of Appeals of Maryland has observed that malice is an "amorphous concept[]" that has "been used in many different contexts." *Newell*, 407 Md. at 636 (internal quotation marks omitted). Malice need not be proven by direct evidence as it is "seldom admitted" and most commonly "inferred from acts and circumstantial evidence." *Id.* at 637.

At the motion to dismiss stage, "the mere assertion that an act 'was done maliciously, or without just cause, or illegally, . . . or for improper motive' is not sufficient." *Manders v. Brown*, 101 Md.App. 191, 216 (1994) (quoting *Elliott v. Kupferman*, 58 Md.App. 510, 526 (1984)). Rather, to defeat immunity, "the plaintiff must allege with some clarity and precision those facts which make the act malicious." *Id.* (internal quotation marks omitted); *cf. Ostrzenski v. Seigel*, 3 F.Supp.2d 648, 653 (D.Md. 1998) ("It *is* enough . . . to allege

24

that a defendant harbored hostility towards the plaintiff *and* caused the plaintiff harm.") (emphases added).[6]

Here, although Marks's complaint affirmatively alleges that Dann acted "malicious[ly]" both in orchestrating the MVF Investment and in approving the Stock Option Grant Plan as a Maxtena director (*see* ECF No. 1 ¶¶ 102, 109), the parties vigorously dispute whether Marks's complaint plausibly alleges that Dann acted with actual malice. Dann insists that, in the aggregate, the complaint's factual allegations establish only that he negotiated a favorable deal for the State of Maryland. (ECF No. 21-1, at 31-39; ECF No. 28, at 2-8). As to his emails characterizing Marks as a "rogue shareholder" and stating that the litigation was a "key driver" in the structure of the deal, Dann maintains that it was entirely proper for him to consider and account for the litigation and Maxtena's ongoing dispute

_____

[6] *Manders*, *Elliott*, and *Ostrzenski* each involved claims against public officials who were not employed by the State and therefore did not directly implicate the MTCA. These cases are nonetheless helpful as the definition of "malice" they use to analyze immunity is similar to the definition used in the MTCA context. *Compare, e.g.*, *Ostrzenski*, 3 F.Supp.2d at 648 (noting that a defendant acts with malice if he "intentionally perform[s] an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff") (internal quotation marks omitted) *with Newell*, 407 Md. at 636 (defining "malice" as "behavior characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud") (internal quotation marks omitted).

with Marks. According to Dann, the litigation "was a fact and had to be dealt with as a business matter," along with many other relevant considerations. Dann further contends that not one of the emails cited in the complaint evidences any sort of personal animus, let alone hatred, towards Marks.

For his part, Marks maintains that "it is hard to imagine how the Complaint's allegations of malice could be any more plausible" given the many documents showing that both the purpose and the effect of the deal designed by Dann was to "singly" harm Marks. (ECF No. 27, at 26-28). Marks contends that any benefit the MVF received as a result of the deal cannot negate a finding of malice, hypothesizing that "[i]f Dann had expressed an intention to promote the MVF Investment by physically assaulting Marks and then proceeded to do so, there could be no argument that Dann did not act with malice." (*Id.* at 28).[7]

---

[7] Both parties also submit and rely on matters outside of the complaint to support their arguments. Dann submits a sworn affidavit (ECF No. 21-2, Dann Aff.), while Marks offers a number of emails, documents, and excerpts from Licul's and Dann's depositions in *Maxtena v. Marks* (ECF Nos. 27-2 through 27-32). With the exception of those emails and documents that are explicitly relied on in, and integral to, the complaint (ECF Nos. 27-6, 27-7, 27-8, 27-9, 27-18, 27-22 through 27-32), these documents are not properly considered in deciding whether the complaint adequately alleges malice. *See Robinson v. Am. Honda Motor Co., Inc.*, 551 F.3d 218, 222-23 (4th Cir. 2009). Moreover, as discussed below in Section III.B.3, the analysis with respect

Most of the MTCA cases cited by the parties involve excessive force claims against law enforcement officials and therefore are largely inapposite to the facts presented here.[8] Indeed, factually analogous cases are few and far between. One theme from the case law is that actual malice can be inferred from factual allegations or evidence indicating that the defendant was motivated by personal animosity towards the plaintiff or by a specific desire to harm the plaintiff. For example, in *Newell v. Runnels*, 407 Md. 578 (2009), several former employees of the State's Attorney's Office sued the newly elected State's Attorney for terminating their employment shortly after he took office. With respect to whether the

_____

to malice does not change even when the extrinsic materials are considered.

[8] *See, e.g.*, *Sawyer v. Humphries*, 322 Md. 247, 261 (1991) (complaint sufficiently alleged malice where the plaintiff averred that a police officer threw rocks at him, wrestled him to the ground without provocation, grabbed him by the hair, and threatened to kill him); *r*, 402 Md. at 186 (where the plaintiff alleged that a police officer shot him in the neck while his arms were raised in surrender, the defendant was not entitled to invoke immunity at the summary judgment stage); *Lee*, 384 Md. at 243 (jury could infer malice based on the plaintiff's allegations that the defendant sheriff deliberately prolonged a traffic stop, yelled at the plaintiff to get back in the car, and ordered a canine search unit without justification for doing so); *Okwa v. Harper*, 360 Md. 161, 179-82 (2000) (denying summary judgment because a fact-finder could infer malice based on the plaintiff's recollection of events, including that the defendant officers physically dragged him from an airport ticket counter, forcibly threw him to the ground, and struck him in the head and neck, simply for failing immediately to obey their instructions to walk away).

State's Attorney was entitled to immunity under the MTCA, the court held that a trier of fact could conclude that the State's Attorney acted maliciously because the evidence "permits the drawing of a permissible inference that Newell's dismissal of Plaintiffs was a targeted act of retribution" for campaigning on behalf of another candidate for the State's Attorney position. *Id.* at 638. Of particular relevance, the plaintiffs had produced evidence showing that the defendant "was agitated by their support" for his rival during the election season and that the defendant had made conflicting statements about whether their terminations were performance-based. *Id.*

Similarly, in *Ostrzenski v. Seigel*, a gynecological surgeon brought suit against another physician who issued a negative report about the plaintiff as part of a peer review process initiated by the Maryland Board of Physician Quality Assurance. *Ostrzenski*, 3 F.Supp.2d at 650. The complaint alleged that the defendant was motivated to write a negative review because the plaintiff had agreed to testify in a patient's malpractice action against the defendant. *Id.* at 652-53. The complaint also asserted that the defendant harbored anti-Polish and anti-Catholic animus toward the plaintiff, as evidenced by his comments about a picture of the plaintiff with the Pope. Finally, the complaint asserted that the defendant had an economic incentive to issue an unflattering review because the

plaintiff posed a competitive threat to all physicians who were not trained in certain specialized techniques. Based on these factual assertions, the court concluded that the complaint sufficiently alleged malice, "albeit only barely so," such that dismissal was not required based on a Maryland statute immunizing members of the Board from civil liability. *Id.* at 653.

Another principle established by the case law is that actual malice can be inferred where the factual allegations or evidence indicate that a public official's tortious conduct is motivated by personal ambition rather than the public interest. Illustrative is *Manders v. Brown*, where the complaint alleged that the mayor and several members of the city council met in secret to modify an urban redevelopment plan. *Manders*, 101 Md.App. at 211-14. Although the changes purportedly harmed the shipyard owner's financial interests, the plaintiff was not provided with any notice of the modifications, nor did the local officials hold any public hearing about them. Rather, the local officials purportedly "stood by[]" while the shipyard owner made business decisions based on the earlier version of the redevelopment plan to his financial detriment. *Id.* at 213 (internal quotation marks omitted). The shipyard owner alleged that the ultimate purpose of the secret modifications was not to further the interests of the city, but instead to benefit

certain influential constituents who the public officials viewed as being important to their political careers and social standing. *Id.* at 213-14. Based on these averments, the Court of Special Appeals held that the plaintiff had sufficiently alleged actual malice because "[p]urposefully modifying an existing urban renewal plan for a corrupt or fraudulent motive to benefit oneself or an influential constituent is a malicious act." *Id.* at 217. The court likewise held that taking action in secret to obtain public funding for the sole benefit of certain constituents "would be malicious," as would using the shipyard owner "as a ploy to carry out the alleged scheme." *Id.*

The facts alleged here do not fit within either of these two lines of authority. Unlike *Newell* and *Ostrzenski*, the complaint does not plausibly allege that Dann harbored any sort of personal animus or ill-will towards Marks. Indeed, when stripped of conclusory labels, the only allegation that arguably hints of animus is that Dann referred to Marks as a "rogue shareholder" in an email. (ECF No. 1 ¶ 53). When read in full, however, the email in question does not suggest any personal ill-will or desire to injure Marks specifically. (*See* ECF No. 27-9). Rather, this email and the others cited in the complaint indicate that Dann viewed Marks's dispute with Maxtena, including the possibility of settling the *Maxtena v. Marks* litigation, as one of many factors that could affect Maxtena's

long-term financial viability and the MVF's investment in the company. (*See* ECF Nos. 27-6 through 27-10).

Additionally, unlike *Manders*, the complaint here does not plausibly allege that Dann acted for his personal benefit. In particular, there are no well-pleaded allegations indicating that Dann sought to advance his own financial, social, or career interests. Rather, the alleged beneficiaries of the deal that Dann designed were the MVF, which purportedly received an equity interest in Maxtena at a below-market price, and the Control Group, who allegedly retained their equity interests in the company without dilution and reaped the benefits of an infusion of capital into the company.

When credited, the complaint's allegations do establish that Marks, along with Telman, ultimately suffered a dilution in equity as a result of the MVF Investment and the Stock Option Grant, both of which were designed by Dann. At the same time, however, Marks's allegations also establish a number of other objectives for, and results of, the deal, including most notably that Dann sought and obtained for the MVF a "substantial ownership [stake] in a promising and rapidly growing technology company at an exceptionally low price." (ECF No. 1 ¶ 11).

In considering the import of these allegations, it is critical to recognize the dual public-commercial nature of the MVF's mission and its dealings with Maxtena. The complaint's

own allegations establish that the MVF is a State entity whose mission is to invest public funds in start-up technology companies and to encourage the retention of businesses and talent in Maryland. In the commercial setting, actions by an employee that are reasonably calculated to reap an economic benefit for his employer generally are not deemed malicious simply because they simultaneously cause economic injury to a third party. As the Court of Special Appeals of Maryland has observed:

> Establishing actual malice in a commercial setting is particularly difficult because of the inherently competitive and aggressive nature of the business environment and the necessity to discern that conduct is motivated by malice rather than the result of a legitimate commercial controversy.

*Postelle v. McWhite*, 115 Md.App. 721, 732 (1997).[9] The *Postelle* court went on to observe that plaintiffs in commercial settings *can* establish actual malice (and therefore be entitled to punitive damages) "when the evidence supports the inference that

---

[9] *Postelle* addressed whether the jury properly awarded punitive damages to the plaintiff and did not specifically address statutory immunity under the MTCA or common law immunity for public officials. It is nonetheless apposite as Maryland courts use the same definition of "malice" for purposes of determining whether punitive damages may be awarded against a defendant. *See Postelle*, 115 Md.App. at 730 (explaining that "[p]unitive damages are recoverable when the defendant's conduct is without legal justification or excuse but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff") (internal quotation marks omitted).

the defendant's motive in . . . committing the tortious act was not [economic] self interest, but rather that the defendant was motivated by a desire to harm the plaintiff." *Id.* at 733. The *Postelle* court thus held that the jury could infer malice because, viewing the evidence in the light most favorable to the plaintiff, "none of [the defendant's] actions provided any economic benefit to [his company]" but instead appeared to be motivated by the defendant's personal irritation with the plaintiff and a desire to retaliate against him. *Id.* at 735; *see also Henderson v. Md. Nat'l Bank*, 278 Md. 514, 623 (1976) (issue of fact remained regarding actual malice where the evidence allowed for a reasonable inference that a bank employee caused a car to be repossessed not to obtain payment for the bank but to punish the car owner after an angry telephone conversation).

The hypothetical Marks offers – *i.e.*, Dann punching Marks under the guise of furthering the MVF's mission – would fit squarely within the reasoning of *Postelle* and *Henderson*, as a physical assault on a shareholder could not possibly be viewed as providing any sort of viable commercial benefit to a potential investor. By contrast, Dann's alleged actions here appear to be reasonably calculated to achieve (and did, in fact, achieve) both commercial and public benefits for the MVF in line with the entity's mission. That Dann's actions ultimately also

33

had a harmful effect on Marks's equity interest in Maxtena is not, without more, enough to give rise to a plausible inference of actual malice.

In sum, when the complaint is stripped of conclusory labels, there are no facts giving rise to a plausible inference that Dann was acting based on ill-will towards Marks or that he was motivated by some improper personal ambition. Rather, the well-pleaded allegations establish only that Dann took actions to further the mission of the MVF and that such actions ultimately caused economic harm to Marks. In light of the circumstances, these facts fail to establish the plausibility that Dann acted with actual malice.

**b.    Scope of Employment**

The Court of Appeals of Maryland has held that the phrase "scope of the public duties," as used in the MTCA, is "synonymous" with the "scope of employment" analysis used for common law *respondeat superior* liability. *Sawyer v. Humphries*, 322 Md. 247, 254 (1991). Pursuant to that general test, the standard is whether the employee's allegedly tortious acts "were in furtherance of the employer's business" and "were authorized by the employer." *Id.* at 255 (internal quotation marks omitted). Although "there are few, if any, absolutes" in the scope of employment analysis, relevant factors include whether the "employee's actions are personal"; whether they "represent a

departure from the purpose of furthering the employer's business"; and whether "the employee is acting to protect his own interests." *Id.; see also LePore v. Gulf Oil*, 237 Md. 591, 596-98 (1965).

Here again, the well-pleaded allegations of the complaint fail to establish the plausibility that Dann was acting beyond the scope of his public duties. Marks alleges, in conclusory fashion, that Dann must have acted outside the scope of his public duties because "[n]o part of the mission of either the MVF or DBED includes the wrongful dilution or oppression of minority shareholders of private companies headquartered in the State of Maryland, or procuring or assisting breaches of fiduciary duty by directors or shareholders of same." (ECF No. 1 ¶ 31). At other points, however, the complaint expressly avers that Dann *was* acting on behalf of the MVF. (*See, e.g., id.* ¶ 11). And, as discussed above, the complaint is devoid of plausible factual allegations indicating that Dann's actions were personally motivated. To the contrary, the most reasonable inference that can be drawn from the complaint is that Dann was, at all times, acting to further the mission of the MVF by seeking to obtain a good value for its investment while also helping to ensure the financial viability of a start-up Maryland company.

Because the operative complaint fails to allege plausibly either that Dann acted maliciously or outside the scope of his public duties, Dann is entitled to statutory immunity pursuant to the MTCA.

### 3. Leave to Amend

In his opposition, Marks does not expressly request an opportunity to amend. (*See generally* ECF No. 27). Marks does, however, offer a number of allegations and documents that are not contained within his complaint to buttress his argument that Dann is not entitled to statutory immunity. Most notably, Marks relies on portions of Dann's deposition transcript from *Maxtena v. Marks*, where Dann characterized Marks as being a "fundamentally irrational" person and where Dann admitted that he specifically instructed Licul not to share certain financial models relating to the MVF Investment with Marks. (ECF No. 27-12, Dann Dep., at 180, 209-11, 222). Marks asserts that these excerpts establish Dann's personal animus towards Marks and reinforce that Dann's purpose in structuring the MVF Investment was "to dupe Marks in connection with the parties' scheduled mediation." (ECF No. 27, at 27-28; *see also id.* at 31).

Even when these additional allegations and documents are considered, the analysis set forth above does not change. When read in full, all that is established by the email in question (ECF No. 27-9) and Dann's testimony about that email (ECF No.

27-12, Dann Dep., at 209-11) is that resolving the *Marks v. Maxtena* litigation was, in fact, a concern for the MVF. At his deposition, Dann explained that the financial model in question contained a "waterfall" analysis with certain "exit valuations" – in other words, Dann had created a financial model demonstrating the effect that various rounds of future investing would have on shareholders' ownership stakes in Maxtena. (*Id.* at 209). Dann explained that, because some of the "high end" projected investments included in one of the models were "completely speculative," he advised Licul not to share the document with Marks for two reasons: (1) because the model did not reflect the MVF's or Maxtena's "realistic . . . expectations of investing" and (2) because he was concerned that Marks might "jump on" the high range of the projected investments "as being the real value of the company," which might hinder the chances of reaching a settlement in *Maxtena v. Marks.* (*Id.* at 210-11). Dann's concerns cannot be characterized as malicious because, as discussed above, the *Maxtena v. Marks* litigation and any possible settlement thereof affected the long-term viability of Maxtena and the MVF's equity investment in the company. Accordingly, there is no basis in the current record to invite Marks to amend because he fails to offer any allegations or documents from which a reasonable jury could infer actual malice by Dann.

As discussed, the MTCA waives the State's sovereign immunity in such circumstances by substituting liability of the State for the liability of the State employee that would exist in the absence of statutory immunity. The MTCA does not, however, waive Maryland's Eleventh Amendment immunity in federal court. *Weller v. Dep't of Social Servs.*, 901 F.2d 387, 397 (4th Cir. 1990). Accordingly, if Marks wishes to pursue these claims against the State, he must do so in State court and otherwise in accordance with the provisions of the MTCA. Counts II and III of Marks's complaint will be dismissed, and Dann's remaining arguments need not be reached.

## IV. Motion to Seal

Marks filed this action under seal (ECF No. 2) and then took the unusual step of objecting to his own motion to seal (ECF No. 3). In its response to Marks's objection, Maxtena expressly refrained from taking a position as to the propriety of sealing the entire case or any portions thereof. (ECF No. 16). Then, in later correspondence that was not docketed, Maxtena suggested that the court should order the parties to file either an agreed-upon proposal for sealing or a motion to unseal.

A motion to seal must comply with Local Rule 105.11, which provides:

> Any motion seeking the sealing of pleadings, motions, exhibits or other papers to be filed in the Court record shall include (a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protections. The Court will not rule upon the motion until at least 14 days after it is entered on the public docket to permit the filing of objections by interested parties. Materials that are the subject of the motion shall remain temporarily sealed pending a ruling by the Court. If the motion is denied, the party making the filing will be given an opportunity to withdraw the materials.

At present, there is no properly supported motion to seal pending. Moreover, it is unclear whether any party supports sealing of this case, in whole or in part. To the extent that the remaining Defendants wish to have some or all portions of the record remain under seal, they must file a motion to seal that comports with Local Rule 105.11 within fourteen (14) days. If no such motion is filed, the entire case will be ordered unsealed at that time.

## V. Conclusion

For the foregoing reasons, the motion to waive page limitation and the motion to dismiss filed by Defendant Thomas Dann will be granted. The motion to seal filed by Plaintiff Jeremy Marks will be denied, and the remaining Defendants will

have fourteen (14) days to file a motion setting forth their positions regarding sealing.  A separate Order will follow.

                              _____/s/_____
                              DEBORAH K. CHASANOW
                              United States District Judge